EDWARD R. DUNHAM, Plaintiff, *v.* THE HASTINGS PAVEMENT COMPANY, Defendant.

*Contract — defense thereto that it is contrary to good morals and public policy — when it need not be pleaded — acts done thereunder considered as evidence of the intent thereof — when the question whether a contract contemplates lobbying services is for the jury.*

The defense that a contract is illegal and void because in contravention of good morals or a sound public policy need not be pleaded where the interests of the general public are involved. The courts in such case will of their own motion refuse their aid to parties so contracting.

While the doing of an unlawful act may be evidence of the intent with which a contract is made and thus characterize it as a contract contrary to good morals and sound public policy, the act is not necessarily conclusive. Where the terms of a contract are clear and unequivocal, the acts done thereunder, in order that they shall vitiate it, must plainly show that in contemplation of the parties the contract was for illegal services.

A contract which contemplates legal services alone is not rendered illegal by the fact that the party seeking to enforce it did illegal acts in its performance.

If a contract contemplates one illegal act which the law condemns, the whole contract will be void even though it also provides for perfectly legal acts.

Conditions and circumstances attendant upon a contract by which a party agreed with a pavement company, desirous of having its paving blocks introduced into the city of New York, to secure the consent of the municipality, and, in consideration of a compensation based upon the number of square yards of pavement laid, to "use and make all reasonable, honest and lawful efforts to secure the right from the city of New York to make bids for laying such pavement or paving blocks upon the streets of the city of New York," which involved the passing of resolutions by the board of aldermen, interviews with city officials, visits with them to other cities where the pavement had been in use and a variety of other work not connected with the procuring of the passage of resolutions or other legislation — considered by the court to require the submission of the question of the legality of the contract to the jury.

Motion by the plaintiff, Edward R. Dunham, for a new trial upon a case containing exceptions, ordered to be heard at the Appellate Division in the first instance, upon the dismissal of the complaint by direction of the court after a trial before the court and a jury at the New York Trial Term.

The action is based upon a contract in writing, by the terms of which the plaintiff was constituted the sole agent of the defendant in the city of New York for certain purposes, and upon conditions therein expressed. The action was tried before the court and a jury, and resulted in a dismissal of the complaint at the close of the plaintiff's case, on the ground that the contract sued upon is void as against public policy; and the question to be reviewed arises on the exceptions to this ruling and to the refusal of the court to submit to the jury the question of the legality of the contract.

The defendant is a domestic corporation engaged in the manufacture of paving blocks known as "Compressed Asphalt Paving Blocks." Prior to 1890 asphalt paving had been done in the city of New York with sheet asphalt only. Upon the suggestion of the president of the defendant, this plaintiff in that year organized a company, brought about the laying of a sample pavement of the asphalt block in the city, and reported to the president of the defendant that the city authorities would require that this pavement be laid for five years before allowing further bidding on that kind of pavement. At the end of this period, and in February, 1895,

the contract in question was made between the parties. It is recited in the contract that the pavement company is desirous of having the use of its paving block introduced into and extended in the city of New York; that Edward R. Dunham (the plaintiff) has offered to undertake and perform the labor of securing the consent, provided he have the exclusive right, during a limited period, of introducing, extending and securing the use of such pavement in said city.

The contract provides for the compensation to plaintiff, based upon the square yards laid under each contract secured, by way of commission, which provision was afterward modified by parol, by fixing the compensation of the agent at fifteen cents per square yard. In the contract the plaintiff agrees that he will, at all times during the continuance of the contract, "use and make all reasonable, honest and lawful efforts to secure the right from the city of New York to make bids for laying such pavement or paving blocks upon the streets of the city of New York."

During the years 1895, 1896 and 1897 the plaintiff, with the assistance of Mr. Rollin M. Morgan, whom he interested with him, secured for the defendant the right to bid in competition with others for paving contracts. This required the passing of resolutions by the board of aldermen, providing for the paving of unpaved streets; the approval thereof by the mayor, etc., and involved interviews with city officials who were experts in street paving, and visits with them to other cities where the pavement had been in use; interviews with Mayor Strong, Commissioner Brookfield and others, including members of the board of aldermen, and a variety of other work not connected with the procuring of the passage of resolutions or other legislation. As a result of this work the defendant secured contracts for paving, and a large amount of its asphalt blocks were laid for the city, and to recover for plaintiff's commissions for such services this action was brought.

The trial court held that the contract, although valid on its face, was, nevertheless, void, because the testimony "indicates that the purpose of this contract was to secure the passage by the board of aldermen, and the adoption by the city of New York, of ordinances authorizing the paving of particular streets in the city of New York with asphalt pavement, and that the resolutions should be broad enough to include the kind of asphalt block pavement which the

plaintiff was trying to have introduced in the city," and dismissed the complaint. To this ruling the plaintiff's counsel duly excepted, and asked leave to go to the jury on the question whether or not the carrying out of the contract in the light of its provisions was or was not, under the rules of law to be laid down by the court, lawful or unlawful; and upon the question whether or not, under the terms of the contract, the acts which the plaintiff was bound to perform in order to comply with the contract were lawful or not.

These requests were denied, to which rulings plaintiff's counsel duly excepted. The court ordered that the exceptions be heard in the first instance at the Appellate Division.

*Samuel Untermyer*, for the plaintiff.

*John S. Sheppard, Jr.*, for the defendant.

HATCH, J. :

The answer which was served in this case did not plead, as a defense, that the contract was illegal or that the service to be performed thereunder was expected to be in violation of any law or repugnant to any principle of public policy. It is insisted that the failure to plead that the contract was illegal and void as being in contravention of good morals or a sound public policy, precluded the defendant from raising such question, and, therefore, did not furnish basis for the court so to rule. It is undoubtedly the rule that a contract is not necessarily void because the enforcement of rights thereunder may be in violation of a statute. Where the statute is provided for the protection of parties and the benefit taken thereby may be waived, the defense of invalidity must be pleaded or the defendant cannot avail himself of it. (*Crane* v. *Powell*, 139 N. Y. 379 ; *Matthews* v. *Matthews*, 154 id. 288.) The rule is otherwise, however, where the general public is affected by the violation of the particular statute, or the provisions of any public law ; in such case the enforcement of rights arising thereunder is or may be opposed to good morals or a sound public policy, and courts will refuse their aid to parties so contracting, and will in every instance leave them as it found them. In such a case it is not necessarily essential that the illegality be pleaded. Courts of their own motion will interfere and deny the right to any relief thereunder without

reference to the state of the pleadings. (*Drake* v. *Siebold*, 81 Hun, 178; *Oscanyan* v. *Arms Co.*, 103 U. S. 261; *Kearns* v. *N. Y. & College Point Ferry Co.*, 19 Misc. Rep. 19.)

In the present case the learned court below took the view that the contract fell within the second class of cases; that it was void as being in contravention of a sound public policy, and for that reason the court would not lend aid to its enforcement. It is evident that if this view finds support in the testimony the learned court was clearly right, and the state of the pleadings would not be controlling of its action. This brings us to a consideration of the contract itself and the acts of the parties thereunder. It is conceded that the contract upon its face is not tainted with illegality, nor does any other infirmity appear therein. It is entitled, therefore, to find favor at the hands of the court, unless the proof of acts thereunder is sufficient to establish, as matter of law, that it was a mere cover in legal form for the performance of illegal acts, and that such was the intention of the parties when it was executed. If it was intended when the contract was executed that under it should be performed what in popular language is called " lobby service," it is void and cannot be enforced. (*Mills* v. *Mills*, 40 N. Y. 543; *Powers* v. *Skinner*, 34 Vt. 274; *Marshall* v. *Baltimore and Ohio Railroad Co.*, 21 U. S. Sup. Ct. Dec. 153.)

These lobby services are generally defined to mean the use of personal solicitation, the exercise of personal influence and improper or corrupt methods whereby legislative or official action is to be the product. It is not, however, the doing of the improper act which is the sole test. There must be the contract and intent that it shall be performed. Of course, the doing of the unlawful act is or may be evidence of the intent and characterize the contract, but it is not necessarily conclusive of it. In *Chesebrough* v. *Conover* (140 N. Y. 382) the action was brought to recover for services rendered in procuring the passage of a bill by the Legislature. The contract was oral, and the question before the court was whether it was a contract for the performance of lobby services. In that case resort was had to the acts of the plaintiff in order to determine the intent of the parties and the character of the contract. The proof given by the plaintiff upon the trial, and the bill of particulars served therein, as appears from the record in the Court of Appeals, showed

that the plaintiff drew the bill which the defendant desired to have passed by the Legislature; that he took it to Albany and there privately presented it to a member of Assembly who was to and did thereafter introduce the same in the Assembly. And at the time of delivering the bill to such Assemblyman he stated to him that he was directed to say that, "if that bill passed he could get what he wanted." That the plaintiff also saw members of the committee privately, who had the bill in charge and urged its passage. After the bill had passed the Legislature he wrote to a member of the committee on general laws, who had the bill in charge, urging that he see the Governor and request him to sign the bill. The plaintiff also testified that in the interviews which he had he urged the passage of the bill upon its merits and did other service such as drawing a report of the State Engineer, also resolutions for the common council of New York relating to the bill, and in respect to the latter he procured the attendance of the clerk of that body at the plaintiff's private office and requested him to urge its passage. In addition to this it appeared that he wrote letters to the member of Assembly who introduced the bill requesting its passage. There was much service in drawing bills, reports, resolutions and in consultation with the defendant in respect to the business. In various forms, beginning with the opening of the case, the defendant raised the question that the contract was *contra bonos mores*, and requested that the complaint be dismissed. The court denied the several motions which were made, and submitted to the jury as a question of fact whether the contract called for the rendition of services which the law condemned, charging them that if they so found the plaintiff could not recover. The plaintiff had a verdict, and upon appeal the General Term of this court affirmed the judgment, which was in turn affirmed by the Court of Appeals. The latter court, in discussing the question, said : " If the plaintiff was employed to render what are commonly called lobby services in procuring the legislation desired by the defendant, then he should have been defeated in his action. Such contracts are condemned as against public policy, and the rules applicable to them are laid down in many decisions. (*Chippewa, etc., R. R. Co.* v. *Chicago, etc., R. R. Co.*, 75 Wis. 248; *Frost* v. *Inhabitants of Belmont*, 6 Allen, 152; *Harris* v. *Roof's Exrs.*,

10 Barb. 489; *Sedgwyck* v. *Stanton,* 14 N. Y. 289.) Here the jury could find that the plaintiff was not employed to render, and that he did not render, lobby services. He was not a lobbyist, and he had no acquaintance or influence with any member of the Legislature, and it does not appear that he had any peculiar facilities for procuring legislation. The jury could find from the evidence that he was employed by the defendant to draw legislative bills and to explain them to members of the Legislature, and to procure their introduction into the Legislature, and nothing more. It does not appear that he asked or solicited any member of the Legislature to vote for the bills, or that he did anything except to explain them and request their introduction; and so much he could do without violating any public policy. It must be the right of every citizen who is interested in any proposed legislation to employ an agent for compensation payable to him, to draft his bill and explain it to any committee or to any member of a committee, or of the Legislature, fairly and openly, and ask to have it introduced; and contracts which do not provide for more and services which do not go farther, in our judgment, violate no principle of law or rule of public policy."

Certainly if the contract could be sustained as a legal contract upon the evidence in the *Chesebrough* case, we see no reason why a similar inference may not be drawn from the evidence in the present record. Some minds, we think, will be impressed with the view that the present case is stronger in its facts upon which to find a legal contract than was found present in the *Chesebrough* case.

In *Barry* v. *Capen* (151 Mass. 99) the court was called upon to construe a contract under which the plaintiff was employed to appear before the street commissioners and advocate the laying out of a street and the terms of damages, for which the defendant offered the plaintiff as compensation all that he could get awarded over $10,000. This proposition the plaintiff declined. The defendant thereupon stated, " You go and get as much as you can, and I will pay you a thousand dollars for it." The plaintiff accepted this offer and appeared before the commissioners. The report in that case does not show just what the plaintiff did under his employment, and the record is not available. Upon the trial the court was asked to dismiss the complaint upon the ground that the contract

contemplated the rendition of improper service and was void as against public policy. This motion was denied, and upon appeal a judgment for the plaintiff was affirmed. In disposing of the question the court, through HOLMES, J., said : " As the plaintiff recovered upon an express contract and not upon a *quantum meruit*, it is not of the first importance to consider what he actually did. That is evidence, no doubt, tending to show what was the contemplated consideration of the defendant's promise, but it is not conclusive. The plaintiff may have rendered illegal services and yet the defendant's promise may have been in consideration of the plaintiff's promising to perform or performing legal ones only. If the contract was legal, it would not be made illegal by misconduct on the part of the plaintiff in carrying it out. (*Howden* v. *Simpson*, 10 Ad. & El. 793, 818, 819; S. C., 2 Per. & Dav. 714, 740 ; 9 Cl. & Fin. 61, 68 ; BARRETT, J., in *Powers* v. *Skinner*, 34 Vt. 274, 284, 285.) The judge having found that the contract was legal, the fact that the plaintiff did things against public policy, if it be a fact, can be considered only as bearing by way of illustration upon the question whether the tendency of the contract necessarily was to induce the doing of such things. If that was its necessary tendency to an appreciable degree, it was void whether it induced the acts or not." In both of these cases it is to be noticed that the question was whether the contracts by their terms called for the rendition of the prohibited service, as in both cases they were oral engagements. In the present case no such question can arise, for here the contract in its terms is without taint, and while undoubtedly the defendant could show that the language used was so used as a mere cover, yet the case in this feature is stronger for the plaintiff than were the cases cited. The rule by which the invalidity may be determined, so far as such determination rests upon the acts of the parties, is the same. But in such case it is quite evident that, where the terms of the contract, as in the present case, are clear and unequivocal, it would seem to be more favorable to the plaintiff and to require that the acts done thereunder should plainly show that, in contemplation of the parties, the contract was for illegal service. If the contract contemplated legal service and that alone, we do not think that it would be rendered illegal by the fact that the plaintiff did illegal acts in its performance. The question is and continues, was the

contract in fact for the performance of illegal service. If it was not, then it is valid and can be enforced. (*Russell* v. *Burton*, 66 Barb. 539; *Armstrong* v. *Toler*, 2 U. S. Notes [Rose], 477, and note.)

One or several illegal acts performed under it may not render the contract void. The question is, did the parties contemplate the performance of such acts by the contract which they made? The court will not stop to separate legal from illegal acts in order to uphold the contract in part. If the contract contemplated one illegal act which the law condemns, it will vitiate the whole, even though it also contract for perfectly legal acts. But the characterization is to be made, based upon a consideration of all that was done. It is clearly evident, therefore, that such question must usually be one of fact, dependent upon a consideration of the contract and all that was done thereunder, and the inferences which may be properly drawn therefrom. It can only be the province of the court to determine the question when the contract, the acts done and all the facts and circumstances practically admit of but one inference.

Application of these rules to the present case shows that this is not such a case. So far as the acts of the plaintiff required that he should see the mayor and other administrative officers, it is not clearly apparent how he could proceed to lay the matter before them except he visited them at their respective offices. That was the place where they transacted the public business, and so far as we are able to see that was the place where the plaintiff had the right to go, and where the performance of the contract required that he should go. He had the right to present to these officers the merits of the pavement which he desired to have introduced, and to induce, if he could, a personal inspection by such officer, not only of the pavement laid in the city of New York, but the pavement as laid elsewhere, and if the plaintiff did no more than this with these officers, then we are unable to see how the act was improper, much less how it could be considered to defeat a right obtained by a contract otherwise legal. It is evident that intercourse with the aldermen stands upon a different footing and should receive more rigid scrutiny. But it is evident that, if all that was done with them was to recommend the merit of the pavement and induce examination by individual aldermen of that which had stood the test for five years, there would exist little basis for condemnation. The diffi-

·culty with this class of services lies in the liability and opportunity for abuse. We should be much better satisfied if the rule announced in *Mills* v. *Mills* (40 N. Y. 543) had been rigidly adhered to and strictly construed. A less rigorous view seems to have become the rule of the later decisions. We think that, adopting the rule as laid down in the *Chesebrough Case* (*supra*), the question stated in the most favorable light that defendant is entitled to have it, required the submission of the question of the legality of the contract to the jury, and it was, therefore, error to dismiss the complaint.

It follows that the plaintiff's exceptions should be sustained and the motion for a new trial granted, with costs to the plaintiff to abide the event.

Van Brunt, P. J., and Ingraham, J., concurred; Patterson, J., dissented.

Exceptions sustained and motion for new trial granted, with costs to plaintiff to abide event.